Judge Rovner, mindful that you're remote, I just wanted to check online. Would you prefer an additional break, or do you want to go forward with our fifth case? That is so kind. I would like to go forward. Okay. Judge Hamilton, you're good? Yes. Okay. So we'll go forward with our fifth argument of the morning. It's in Appeal No. 2431-64, Maria DiFranco v. City of Chicago. Mr. Shoup, I see you. Nice to see you. And then Mr. Collins, yes. May I please the Court, Dublin Scope, on behalf of the estate of Marco DiFranco. Your Honor, the Chicago Police Department is a paramilitary organization. It has officers that have ranks, a chain of command, that gives orders. Those orders are not suggestions, they're not aspirational hopes. In March 2020, in the wake of the COVID-19 pandemic, CPD enacted a special order, Special Order 04-09. It was an accommodation measure. It was a recognition that there are officers in the police department that were at high risk of contracting a serious illness and death from COVID-19 if they had certain underlying medical conditions. Marco DiFranco was an undercover narcotics officer who did have one of those serious conditions. He had cystic fibrosis and cystic fibrosis-related diabetes. On March 19, 2020, consistent with Special Order 04-09, the Chicago Police Department advised all officers at risk, all officers actually, that if they needed one that's an alternative work accommodation to make sure to reduce the risk of catching COVID-19, submit the paperwork. Within two hours of that special order going out, the notification of the special order, Detective DiFranco complied. He submitted all the requisite medical paperwork to the medical section. The medical section's doctor, Dr. Susan Argimont, reviewed the information, realized that he qualified for an accommodation, forwarded it to the CPD Human Resources Director, Robert Landowski, and Robert Landowski never responded. Two days later, and we know that because Chief Landowski testified. He saw the paperwork for the first time when he was sitting in his deposition. He realized that there was no follow-up from him or anybody else at the medical section directly engaging Officer DiFranco, Detective DiFranco. Two days later, on March 21, Officer DiFranco sent a self-certification following up on the request. Again, nothing in his medical record, nothing in his medical file showing that CPD followed up. Chief Director Landowski admits that that's the case. Dr. Argimont admits that that's the case. And the city's risk manager, excuse me, the Chicago Police Department's risk manager, Michelle Morris, they all said there is nothing in the record that says that there was any follow-up. Nothing. Now- Mr. Shoup, forgive me, Mr. Shoup, whatever questions you've raised about the March 19th COVID exposure report that Sergeant Fennec completed, I take it you do not dispute that Mr. DiFranco was, in fact, exposed to COVID on the morning of March 19th, and you have not documented any other workplace exposure that might account for his illness and death. So what I am trying to figure out, and I know you'll help me, in what sense could any error or delay in the city's response to the accommodation request have harmed Mr. DiFranco? Judge Roper, I want to thank you for that question because I think it's going to help us get right to the point here. What I will agree for the rest of this case, hopefully when we go back down to trial, is that there is no dispute from the plaintiff's perspective that Marco DiFranco definitely contracted COVID-19 while he was working for the Chicago Police Department. The Police Department admits it itself. Our point is that there is a question of fact about when specifically did it happen. It could have happened from our perspective, it could have happened sometime on March 19th, 20th, the 21st, the 26th, because proximate cause is a question of fact, and the one thing about, the only thing that we know about the March 19th time frame is what we know from the, what I would refer to as the VanEck Authored Exploited Reports, that didn't even exist until April 2nd, 2020, after Marco had already died. So the options are, so you disagree with Judge Rovner on, as to the 19th? I'm not saying... You're just saying there's an open question. It could have been the 19th, but it could have been Friday the 20th. It's not likely it was 22 or 23, or 21 or 22, because he didn't work. That was a Saturday and Sunday. Monday was the 23rd, and he was in the shop on the 23rd. So I'm saying that he was on duty, definitely on duty on the 19th. Judge Scudder, what I'm saying is this, is that a jury, 12 people could sit in the room and they could say, listen, given the circumstances of the creation of this document, and given the incons... When I'm saying the document, I'm referring to the exposure report that says March 19th and 19th. Yeah, I know what you're talking about. Right. So that VanEck could have literally sat there after talking with Sanchez. See, the thing that's odd to me about your argument, or I just want to try to break through a little bit, is that I don't think there's any question that the document is backdated as a matter of fact. No, but I don't read the city to be saying, in fact, it was filled out on the 19th. No, no, no. It was definitely filled out later.  Okay. But when it was filled out later, it has, I mean, we have it in front of us. It has that little narrative in there about, is his name VanEck? Yeah. Sergeant VanEck or something? Yeah. That what his belief... Then Sergeant, now Lieutenant. Okay. Mr. VanEck, as to what his belief was, as to when, because he had some awareness of what your client did at the station house on the 19th. But it's... It's definitely filled out after the fact. Well, yeah. But it's all... Well, yes. No one's disputing it was filled out after the fact. Right. Right. But what I want to also make sure about this, is that it was filled out after the fact, knowing that he was already dead, knowing that no one had followed up on the reasonable accommodation request earlier, which means that's our argument, and that which means that he has free reign to decide what time to put on that document. Okay. The reason I wanted to ask you, what's the... Step back from the fact pattern. Okay. I know it's a tragic fact pattern. There's no question about that. Right. Okay. But step back from the fact pattern. What do you believe the law requires when it comes to whether an employer has acted timely to provide an employee with a reasonable accommodation in the ADA? I'm sorry. I missed the first part. Okay. What's the legal standard measuring the timeliness of accommodation? What's the ADA require? How do you articulate that standard? I would say in this circumstance, your honor, that if the city had tried to make some attempt within under these particular circumstances... Forget this fact pattern. If we had to write an opinion... Okay. Okay. And whoever has to draft the opinion comes to that sentence where we have to type it how do you figure out whether an accommodation was timely? Because I would think that timeliness of an accommodation is part of the reasonableness of an accommodation. I think it really depends on the particular circumstances. And here, when you know that you're dealing with a high-risk individual... Okay. So that's the standard. Just the reason... Is that what you're saying? Reasonableness of the timing... It's the totality of the circumstances. So it's going to be how soon did they respond given the emergent circumstances of the situation. Okay. And do you know of any case law on this? Your honor, no. Yeah. I mean, I don't think there's much out there, if any. And your honor, I've got two minutes. We're going to give you time. Don't worry about it.  So... Okay. Anything else you want to say in response to that? About... I think it's multiple things. I think any employer would have to figure out, okay, what are my circumstances? What is the nature of his condition? What are the nature of his job duties? What's he actually doing? There's high risk and there's high risk. Are there certain things that we're trying to figure out on a temporary basis to make sure that he's not going to be exposed? For example, his normal internet duties when he's doing his corporate buys is to go to home and square. Okay. Well, can we make sure he has to go through one specific location so we can figure out what we're going to do with him? Can we do this? Can we do that? We have to troubleshoot. But that's the whole point of the interactive process. You have to engage the individual, talk to them, figure out what works, what doesn't. Well, that's what they were doing on that Monday, I thought. No. No. What do you mean? What I mean by that, Judge, is this, and that's why I started with, there is a very regimented process. They had to talk that there are only two people, only two people that really could have engaged with this process. That would have been per CPD's rules. That would have been his commander, Commander Kimball, and then also been Chief Landowski, excuse me, Director Landowski and Chief O'Donnell for the medical section. Those two would have to talk to Kimball with Marco to figure out an actual accommodation. That was their rule. That was their order. That's what S0409 required. The city said it's no big deal because if we don't follow our rules because Vanek talked to him later or Sanchez talked to him later, neither of those individuals had authority to give Marco anything. They could have said, Marco, we'll give you this, we'll give you that. It had no binding effect within the Chicago Police Department per their order. There were only, literally, Your Honor, I'm not exaggerating, Director Landowski said this. Well, hold on. I thought in one of those meetings, don't worry about the clock, I thought in one of those meetings, maybe more than one, I have in mind Sanchez and is it Sergeant Vanek or Lieutenant Vanek? At the time, Sergeant. That they recalled your client saying, no, I've worked this out with Vanek and the workout was we're going to single car surveillance and I'm going to be out looking at the lakefront or Millennium Park or something. If I may, Your Honor, because this is the part where the fact pattern and the conflicts materially go all over the place. So per Commander Kimball, who was the only person that was authorized to really give my client's husband an accommodation, his version of events was on March 23rd, suddenly and spontaneously, you see Officer DeFranco walks into his office, is worried to death, scared to death, almost to the point of tears of dying of COVID, but then suddenly says, and then that's when Commander Kimball apparently says, go off to the medical section. Although Kimball says, maybe I did, maybe I didn't, he sort of waddled off. The medical section is Sanchez.  The same day, the very same day, on the heels of that conversation with Kimball, Marco goes to see Sanchez and we know that it was on the 23rd. The version that Captain Sanchez gives is that Commander Kimball ordered Marco to go to the medical section to seek an accommodation. Well, if he'd already gotten an accommodation he was happy with, the commander would not have sent him to the medical section to do it. More importantly, because they all later say, well, he was given this accommodation by guarding the beach over at Lakeshore Drive, which was the infrastructure that Marco was allegedly protecting. If that's the case, and if that had truly been given to Marco as an accommodation, as part of some interactive process, then it would have been documented. It wasn't documented, Your Honor, and that's what everybody kept saying. It had to be contemporaneously documented. Mr. Shoup. Yes. I want to see if I understand this correctly. Yes. Is there any affirmative evidence that plaintiff was exposed to COVID virus after March 21st? Well, we know that, I don't mean to be curt, Your Honor, but obviously he passed away from it and then the city applied the rebuttable presumption under the ODA. Well, the rebuttable presumption, I assume, provides additional benefits to the family, correct? Death in service? It's more of a city of Chicago Police Department situation about what he would be or could not be able to. So the ODA was, I'm sorry, I'm trying to understand Your Honor's question. Keep going. Okay. So what happened, Your Honor, is this. After Marco had passed away, the awards committee has to decide whether they're going to designate his death as a line of duty death or not. Right. It's an ad hoc committee. It only meets when officers die. So they met on April 2nd of 2020. In anticipation of that meeting, they usually get all of what would be the relevant records, okay? So when an officer dies, they usually get autopsy reports, injury on duty reports. None of those documents existed when Director Lewandowski reached out to the medical section to ask for documents to figure this out.  So they didn't even have the exposure report. So, based on that situation, they, according to the city, relied on a rebuttable presumption in a statute that didn't even exist until two months later. Look, let me try to cut to the chase. Yes, Your Honor. I understand we've got conflicting stories coming from defense witnesses. Yes. I'm looking, though, for affirmative evidence that would support a reasonable conclusion of proximate cause of his death after the 21st. Your Honor, my position is the proximate, the exposure could have happened on the 19th after the first request was submitted, and that because that happened on the 19th while he was still on duty, but the symptoms didn't manifest until the 21st or the 23rd or the 26th.  Well, he definitely falls by the 26th, but, you know, there could be subtle symptoms before you think that they fall, so. Did you say that in the briefs? Did you say that in the briefs? Excuse me, Your Honor. Did you say what you are saying now in your brief? We argued the proximate cause issue was a question of fact, Your Honor, in our underlying summary judgment motion and in our opening brief. I understand you asserted that. Is your theory now that Detective DeFranco was exposed to COVID on the 19th of March after he had requested an accommodation? My position as a jury could reasonably conclude that, yes, Your Honor. But that's, is there any other theory that gets you to proximate causation that is somehow the police department's fault? Yeah. It could be the 19th. It could be the 20th. He's not on duty the 20th and the 21st. He's not on duty on the 20th or the 21st. Okay. He does submit, he does submit the certification on the 21st. He also then reports to duty on the 23rd, still packed up. So that's, which means that if he could have gotten, if he. Well, I'm trying to, I'm trying to get to the point of whether you've got affirmative evidence to any of this effect or whether you would just ask a jury to be sympathetic and speculate in your favor. It's called a reasonable inference, Your Honor. So I'd say. How? Because the city admits that he was on duty on the 23rd, which is after he submitted the second request on the 21st and after he submitted the first request on the 19th. So when all the paperwork purporting to establish the existence of accommodation is documented. And what happened to him on the 23rd that put him at risk? Was it just being in the meetings to request the accommodations? And going to Holman Square, the same location where everybody's around each other? Yes. Because the whole idea. So I'm trying to, my problem is I'm trying, as I understand it, the wrongful death, you need to prove not just negligence, but willful and wanton misconduct. Right. And I'm having real trouble getting there. The source of the willful and wanton misconduct, Your Honor, is the notion, our position is that you can reasonably infer that when you create documents that are internally inconsistent about what people actually said about what truly transpired, that's evidence of consciousness of guilt that they didn't do what they were supposed to do. And now they're trying to conceal the fact. Okay. That's your theory? Yeah. Okay. Thanks. We'll give you a couple. We used a lot of your time. We recognize that. Okay. You'll have a couple minutes for rebuttal. Don't worry about that. All right. I want to pause though. Judge Rovner, did you have another question for Judge Scope before we switch over to the city?  No, but... I'm sorry. Mr. Scope. Hold on a second. I thought that everyone agreed that the date was March 19th. Everybody agrees that that's what Sergeant Vannick claims was one of the possible moments that he was exposed. That's correct, Your Honor. But my position is the problem with that is that Sergeant Vannick creates the report on the 2nd, which is right after he gets the phone call from Captain Sanchez, who by that point in time has already talked with Chicago Police Department's General Counsel about what's going on with all this. And then suddenly, fast and furiously, a bunch of documents come into existence. So our specific theory is that it's not just that we believe that the narrative could possibly be right, but we also think there's other circumstantial evidence that suggests it's not. For example... Yeah, we got it. Okay, we got it.  Thank you, Mr. Scope. We'll come back to you for rebuttal. Thank you. Thank you, Mr. Scope. We'll go over to the city. Mr. Collins. Good morning. Good afternoon. Good afternoon, and may it please the Court. Summary judgment for the city was proper. Plaintiff's wrongful death claim fails because there is no evidence that any alleged wrongdoing by the city caused Officer DeFranco to contract COVID. And plaintiff's claims under the ADA and the Human Rights Act fail because the undecided evidence shows that Officer DeFranco, in fact, received an accommodation. But I'd like to start with the wrongful death claim, which is premised on an allegation that the city denied Officer DeFranco a workplace accommodation, which caused him to contract COVID and ultimately pass away. The district court correctly determined that this claim fails for a lack of proximate cause. Specifically, plaintiff has no evidence that Officer DeFranco was exposed to COVID after he submitted his request for an accommodation. And in fact, the only evidence in the record about when the exposure took place is Sergeant Vanek's exposure report, which shows that the exposure had happened by the morning of March 19th. It doesn't show much of anything at all reliably, does it? We concede, Your Honor, that there's evidence in the record that the report was backdated. Plaintiff, though, does not dispute the narrative section of that report, and there's no basis for disputing the date of exposure either. The exposure report explains that Sergeant Vanek was notified of the exposure by the morning of March 19th, and so the exposure must have happened before then. The narrative explains that the exposure likely occurred because there was a detective who worked out of Homing Square who had tested positive at that time. And more importantly, there's no evidence in the record suggesting that the exposure happened after Officer DeFranco submitted his request for an accommodation. So as the district court recognized, even if a finder of fact completely disregarded the exposure report, summary judgment would still be proper because plaintiff has no evidence showing that the exposure happened after he submitted the request for an accommodation. And absent evidence establishing proximate cause, summary judgment on the wrongful death claim was proper. I'd like to address the ADA and Human Rights Act claims, which are for failure to accommodate. The district court recognized or correctly decided that these claims fail because Officer DeFranco in fact received an accommodation. As Commander Kimball explained, as of March 21st, 2020, all officers in the Narcotics Division were reassigned to monitoring compliance with the governor's stay-at-home order. That reassignment had officers working out of their own police vehicles where they did not come into close contact with anyone else. And plaintiff does not dispute that that kind of work would constitute a reasonable accommodation under both the ADA and the Human Rights Act. So because Officer DeFranco received an accommodation, plaintiff's claims under the ADA and the Human Rights Act fail. Is your point on that that the record, the city's position, the record evidence shows that the accommodation was effectively conveyed on March 20th through the combination of Governor Pritzker's order and CPD's response, or maybe not CPD writ large, but the Homan Square-based Narcotics Unit response to that? Yes. So I think Commander Kimball's declaration explains that Governor Pritzker announced the stay-at-home order on the 20th and that the order was to take effect on the 21st. And in turn, the Narcotics Division officers were reassigned as of March 21st. Which would have been, what, Saturday? Saturday, yeah. And Officer DeFranco was not working that day or the 22nd. The record establishes, though, that by the 23rd, when Officer DeFranco was working and when he met with Captain Sanchez, Officer DeFranco knew of that solo car reassignment monitoring infrastructure because Officer DeFranco informed Captain Sanchez that he was good with that assignment. So, in other words, Officer DeFranco accepted that reassignment that every officer in the Narcotics Division received. Can I ask you just to step back from the fact pattern? Do you know of any case law? And whether you do or you don't, what do you think the standard ought to be on the timeliness for accommodating? Certainly, Your Honor, we don't know of any case with as short a timeline as this one where an employer was found liable for failing to provide a workplace accommodation within the time span that we're dealing with here. I don't know. I mean, I can see how it would be a fact-intensive inquiry in general. But at the same time, we're not aware of any case where... Yeah, the cases are just very different. There are situations where somebody needs a different desk or they can no longer lift something. There's a real urgency here. He's in a very, very delicate health situation. And we have a global pandemic that's setting.  But as Commander Kimball's declaration explains, this Narcotics Division-wide reassignment of narcotics officers took effect as of March 21st. Granted, Officer DeFranco was not working that day. But by the time he returned to work on the 23rd, he had received that reassignment, which is just a matter of days after he submitted his request for an accommodation. There's something I just have to clear up for myself, and that is the estate did not contest the accuracy of the report, did it? The estate did not contest the accuracy of the narrative section of the report. I understand the estate takes the position that the report was backdated. But I'm not aware of any allegation by the estate that any of the actual contents of the report are false, in other words. Thank you. Those are all I have prepared. If the Court has no further questions, we ask that the judgment be affirmed. Okay. Hearing none, Mr. Collins, thanks to you. Mr. Scope, we use a lot of your time with questions, and I want to make sure that you have some rebuttal time, so we'll give you a couple minutes. Thank you, Your Honor. First, let's address what Mr. Collins just said about this declaration. Lieutenant Ronald Kimball's declaration dated April 11, 2024, which was signed about two years ago. His deposition was originally December 13, 2022. His post-deposition declaration reads, in paragraph 12, as a result, comma, after March 21, 2020, officers assigned to the narcotics unit, including Officer DeFranco, were no longer required to come to Holman Square. After, so that means that the first possible day that Marco DeFranco could have been on this new accommodation would have been March 23rd. March 23rd is the same day he goes straight into his commanding officer's office to complain about how he needs an accommodation. He did that after he had previously submitted his second request for accommodation with a self-certification form that the CPD told him to use, and he said, point blank, I want an accommodation. That response, and there's an email response in the appendix that shows that he was specifically instructed to follow up with his commanding officer, which would have been Commander Kimball. So he actually follows the rules. Marco sends in a second request where he didn't get a response to the first. He goes in, per his email response from the Chicago Police Department, to talk to Kimball, and that's why he's going into Commander Kimball's office on March 23rd at Holman Square. The same Holman Square where the CPD said in its narrative section was a place where Marco could easily contract COVID, and going to Holman Square to try to engage your commanding officer in the interactive process, as far as I'm concerned, is part of your job duties since you're trying to take care of an accommodation request. So Judge Hamilton, going back to your question about proximate causation, he puts in a request on March 21st, a second request. CPD says go talk to Commander Kimball, per the email response. He does that that first morning, the morning of March 23rd. So he could have gotten it then. He could have gotten it on the 21st. He could have gotten it on the 20th. Those are all questions from which a jury could reasonably infer that's how he got it and when he got it. As far as the narrative section, the veracity of the report, Judge Scudder, you're absolutely correct. It was backdated. Everybody says it's backdated. I'm saying something just a little bit more. I'm calling people liars. I am accusing people of fraudulently creating documents. It's not just submitting something after the fact. It's lying about important details. The narrative section, we're not taking issue. No, I think you're clear on that, Mr. Scudder. You're clear not only in the courtroom. Your briefs are clear. So I don't think we're misunderstanding that. You want to just leave us with a closing thought? Yes, and this is the closing thought, Your Honor. Twelve people in a room can look at the same picture and see 5,000 different things from it. I think 12 jurors could look at all these facts, all the facts the city wants to tell them about, all the facts we want to tell them about, and they can come up with a lot of different conclusions that are based on reasonable inferences that Judge Daniel just didn't make. And for that reason, that was not compliant with Reeves and the Rule 56 standard to view all this evidence in a light most favorable to Maria DeFranco. Maybe she will win, maybe she will lose, but she deserves a shot to put these facts, as crazy and as convoluted as they are, in front of a Northern District of Illinois jury, and that's what we're asking for, just a chance. Thank you, Your Honor. Very well. Mr. Scope, thanks to you. Mr. Collins, thanks to you. We appreciate the advocacy on both sides. We'll take the appeal under advisement.